We'll hear argument next in Mobile Media Ideas against Apple, No. 14-1060. Mr. Reilly. Good morning, Your Honor. May it please the Court. My name is George Reilly. I represent the defendant appellant, Apple. With the Court's permission, I reserve six minutes for rebuttal and response. I would first like to address the 07-8 patent. The 07-8 patent broadly claims a mobile cell phone with a camera and a microprocessor and a means to transmit pictures taken by the camera. The Court committed two errors with regard to the 07-8 patent. First was an error of construction. The Court improperly construed the means plus functions terms in failed to find that the Claim 73 is invalid in light of the prior art. In fact, the invalidity case was stronger than the case in KSR, and yet the Court committed the same error that led to the reversal. A re-exam certificate just came out on this patent, right? That is correct. Confirming the patentability of Claim 73. Yes, and that is correct. In view of the same prior art references that you're trying to convince us render the claim invalid. And predicated on a mistake, a mistake that both experts in this case agree, and that is namely that the prior art shows a microprocessor in Lucent that actually does image processing. And the Patent Office said expressly that that was not the case. That was a mistake. In this case, the District Court judge found all of the elements of Claim 73 are in the error. So turning first to the means plus function construction. The term at issue was means for transmitting the image data. Can I ask you on that, I guess, two things. One, the original Claim 17, a dependent claim, seems to suggest that images can be transmitted by the SMS, and I guess that's one question. The other question is, does that mean that a piece of the specification says that the camera is to be treated as a, what is it, a data something device? And so why is everything said about the data collection device equally applicable to that particular kind of data collection device, namely the camera and the picture that is captured by the camera? Not an SMS message, not any other kind of data. Claim 17 talks about using SMS to send at least a portion of an image, does it not? Or a portion of data. There's no disclosure. A portion of said image. Of said image. And that was an image that was, for example, on a sketch pad or a pad where you write a message. Not an image captured by the camera. Claim 73 is very specific. It's with regard to a picture that is captured by the camera, as opposed to some other kind of image. So the issue is really one of Claim 73's image captured by the camera. I guess I want to just spend a little bit more time on this. The original Claim 1 talks about a camera for receiving image information. And then 17, as a dependent claim, says means for transmitting image information comprise means for transmitting of at least a portion of said image information as an SMS message. Why does that not convey that SMS can be used for transmitting what comes out of the camera, which is what Claim 1 calls image information? Because the only structure that is disclosed is a modem. A facsimile modem. That is the only structure that is disclosed in the patent. There is no disclosure of any sort of, you know, what we would consider today, and again this was back in 1994, sending an image using a text message. That's not disclosed. Claim 17 lacks written description support because it says SMS right in there. But it doesn't disclose in the means plus function language of Claim 73 what the structure is. That structure, if you're going to claim under 112 paragraph 6, you have to clearly link and associate to the structure. And the only structure, the only structure that is disclosed is a facsimile. I'm a little confused now about the argument you're making. Are you saying that even if it's true that an image data can be sent by SMS, which you say is not true in your brief, but let's assume that we conclude that it is true, are you saying that there had to be additional structure disclosed in the specification in order to support the means plus function claim including SMS? Yes. For example, what structure would you have in mind? Just like this Court said in Medtronic, there has to be not only a structure but a clear linkage between the structure. But what kind of thing you would look for in connection with the SMS conveyance of image information beyond simply asserting a camera using SMS to transmit image information? For example, something in Figure 4 that would say, here is how the cell phone is going to use SMS protocol to transmit an image captured by the camera. There's no circuit description, there's no line diagram, there's no structure. It's just asserted in a claim. There's no structure. And that's why we get this circularity in the claim construction. The Court said the means for transmitting the image is the cell phone. Going back to the re-exam, didn't the examiner interpret means for transmitting here a little differently? In the sense that in his view, it encompasses an SMS message so long as you, after you've captured the image with the camera, you do some kind of processing to the image by extracting the text out of that captured image and then transmit that data, that text in an SMS. Am I understanding the examiner's construction correctly? No, I don't believe so. The examiner did find, because it's actually in the claim itself, that you have to be able to recall the image for processing. That's one of the claim elements itself. And that is satisfied in the prior art for example by Lewis. But what did he say about the means for transmitting? He talked about how it can encompass some form of SMS message. But he did not identify the structure, the actual structure in the disclosure that would allow you to say the means for it. There's nothing in this patent at all that points toward SMS transmission of images. Nothing. But you'd have to agree with me that necessarily for him to construe this means plus function limitation as encompassing an SMS transmission, that he concluded that there was some kind of structure in the spec to support that understanding of means for transmitting. No, I disagree because the issue in front of the examiner was one of prior art. Did the prior art disclose a means for transmission? And giving, as they do in a re-exam, the broadest possible construction to the terms. He wasn't faced with this specific argument about means plus function. And what we have from the district court is a circular argument. The means is a cell phone. Well, that's what's claimed, a cell phone with a means for transmission. And the court said, well, the means for transmission is a cell phone. It's a completely circular construction. And that violates this court's jurisprudence on means plus function construction. Turning now to the invalidity issue, if I may. Would you say the same, just very briefly, just to make sure I understand. Would you say the same thing with respect to email transmission, that in order to support an SMS transmission, conclusion that email transmission was among the modes of transmitting an image, you would have to have some structure recited to show how the machine transmits emails? Correct. If you say a means for transmitting, including email, you have to have some structure that's disclosed to show how that's done. To put the public on notice as to what structure and means are being used. You can't just simply assert the words. They broadly claimed means for transmitting. They should be held to what's actually disclosed. And the only structure that was disclosed was the facsimile modem, as the court held in the Eastern District of Texas. Turning to invalidity, this is a very, very compelling case. There is no dispute. There is no dispute. The only difference here is the use of a microprocessor, an off-the-shelf component, which can be substituted in Kyocera for the control circuitry. In Lucent, that is a 3210 microprocessor, nothing fancy, nothing elaborate. You're substituting a known component to perform its regular and expected functions in Kyocera. Has this court said that a motivation to combine references is a question of fact? What this court has said is a question of fact can be raised by that. But of course, that's subject to this court's de novo review to determine whether there's substantial evidence or not. This court has also said in the Supreme Court, in KSR unanimously, this very argument was made. Was there motive to combine the sensor for the adjustable pedal in KSR? And this court held, overturning a summary judgment, well, yeah, there could be a question about motivation. Would you put it in the exact place that's in the patent? How would you do it? And the Supreme Court said that inflexible demand for motive to combine is improper and reversed. In this case, all of the gram factors are satisfied, every one of them. And there's not one shred of secondary factors, no secondary considerations. They couldn't introduce anything to say using an off-the-shelf microprocessor was novel. In the 078 patent, 10 words are added to it. It's treated as off-the-shelf. There's no teaching in the 078 patent about how to program it or that it's complicated. It's treated as a standard component that is substituted for circuitry. So you're invoking the general idea that the challenger can't demand more teaching than the patent, not the challenger, that they can't demand more teaching than their own patent provides. That is correct. They rely on a person's skill and the art to understand microprocessor, 10 words, okay, I can implement it. Well, they can't demand more from their prior art. But in this case, Lucent identifies the microprocessor, identifies the algorithms that's to be used. It goes much more detailed. It has already solved the problem of using a microprocessor in a camera. Can I ask you a question? You're already into your rebuttal time, but we'll give you some more time. But on the next patent, the 068, did you make to the jury the precise obviousness argument that you're making? Yes, we did. And the jury, and I believe there is no substantial evidence to hold that two-key hotkey is somehow novel or different from a one-key hotkey. Bayless teaches both. Bayless teaches using two-keys or one-key hotkeys. That cannot possibly be an invention, to drop a menu hitting one key rather than two keys. I reserve the rest of my time. And we'll restore your full rebuttal. Thank you. I'm sorry. May it please the Court. I get to do four patents in my 12 minutes, so let me try to get started with the ones that he left there. So the 078, first, the 078 patent has now been reexamined four times. The most recent time, as Judge Tan noticed, over the last reexamination, made a simple mistake about what the prior art should have been. If the examiner made a simple mistake, then so did the jury, and so did our expert. No, we don't. If we thought the examiner made a mistake, it would have been our obligation to point that out. Well, what's missing in the prior art? We're talking about kiosks that are illicit. Right, that's right. What's missing there, in terms of the elements of the claim? Your Honor, this patent, the 078, is a sophisticated architecture. In a sense, it's the first smartphone patent. It's not just a camera phone. The camera phone is one element. Kiosera and Lucent are cameras that are just different. In our patent, the 078 is a phone that has all sorts of features, calendar features. It is a smartphone. Kiosera is missing a number of elements. It doesn't have the two processors. Kiosera doesn't have any processor. Their position is that you can take the Kiosera reference, if you look at it. There's a control circuit, which is really the on-off circuit, just the on-off switch. Their position is that you can just drop a microprocessor into that, and that completely redoes everything. Well, Your Honor, if you look at the Kiosera reference, and I think Judge Bryson might be pulling it out. If you look at, let me show you exactly what we're talking about. And if you're in the appendix, it's 57609. And if you're in the appendix, it's 57609. And what they're saying is you take out this control circuit 25, and you drop a microprocessor in. They say that's all you need to do. Well, the claim requires that that microprocessor be connected to control the image information. It isn't. That microprocessor isn't anywhere in the path doing anything. They're suggesting that you have a complete redesign of this It tells you to take the picture. That's all. But what the claim requires, if you look at the claim for this patent, the claim requires that that processor process image information received by the camera. That 25, you drop a microprocessor, and that's not processing any image information. It requires that that microprocessor be coupled, that it be used for transmitting the image information, which is the entire right side of this thing. And that microprocessor doesn't do anything, wouldn't do anything for transmitting. And it requires that that microprocessor be used for processing the image data. They're talking about a complete redesign of this thing. Essentially, their argument is because a microprocessor can do anything, that somebody could take this product, this thing, this Kyocera, redesign it entirely to drop a microprocessor in. Can I just ask, on this figure from Kyocera, 25 control circuit has a microprocessor. A line with arrows at both ends going to the control circuit inside the right side. Right. Is that pertinent to whether information is going from 25 control circuits? There's no information going back and forth. This is an on-off switch. This is a power, turn it on. This isn't a microprocessor passing data back and forth. So what that is showing is when you push the button 12, right, the release button, that that control circuit snaps the picture. And it's not in the loop. It's not managing any of the information. And then what you show it is connected to a different control circuit. So what you're seeing is button 12 turns two things on. What you see, the arrows going back and forth, is really it's the connection to button 12 that shows this thing going back and forth. There's no disclosure here. I mean, you're looking at something with arrows. But what Kyocera was, was a camera. And they said, we have a camera. Let's connect a telephone to it. And that's all it does. Period. And their argument is that you could do a complete redesign. Now here's an interesting thing about Kyocera. That was five days before our patent. So if you want to talk about obviousness, and they say it would have been obvious to drop the microprocessor in. Well, the person who's the closest art they can find five days earlier isn't touching on microprocessor, not even mentioning it. What they're talking about five days earlier is the best prior art. It's something that just says, let's put this telephone in the same box as our camera. The Japanese equivalent was much earlier than just five days earlier, right? The which equivalent? The Japanese equivalent of the Kyocera prior art. No, I think the Kyocera, well, the prior art date on this is May 1994. The application dates earlier. So even then, but this is the closest prior art they can find. Now, that's a major redesign, that architectural. You've got to look at all the claim elements. We can't go down the path of simply saying, could you take a microprocessor and do anything you want with it, and redesign this circuit. What, again, remind me, what is missing from Lucent other than the display screen? So Lucent is missing a second microprocessor, and it's not a telephone. So what Lucent is, is it's a camera that has a cell phone built in to transmit images. We can debate whether, I mean, there's no voice in Lucent. It's simply a camera that sends the images out. And there's one sentence in Lucent that says, that telephone connection can be done through a cellular phone. It's not a phone. There's no context of telephone talking. It's talking about doing it through the cell phone network. What does that mean? I didn't understand what it means to say that communication can be done through a telephone, a cellular phone. You mean, a cellular phone can simply be used as a... A data transmission device. As a line, in effect, across... That's all it is. That's all it is. You can read that all you want. It's all about doing it on the regular telephone line, connecting it through a regular telephone line. And there's one sentence that says, you can also connect it, I think there might be two sentences that say you can also connect it through the cell phone network. I'm sorry, and so what's insufficient about that in terms of the claim language of Claim 73? No, I'm just pointing out that we're trying to combine these two things together. It wouldn't have been obvious to combine these two things together. But what Lucent doesn't include is a second microprocessor at all. That F, what we call, what people have been referring to as the F3 limitation. There's no testimony below that it includes the F3 limitation. And in fact, it doesn't. So doesn't this go right back to the non-infringement theory about the means for processing and means for storing image information in the camera unit of the cell phone? And how you need a separate processor and a separate memory in the camera unit section of the overall cell phone. So separate as opposed to dedicated. They're trying to put the word dedicated in to say it does nothing but. Now below we did show the Apple has two processors. So the processor isn't an issue here, because the Apple has two. The issue here is the memory. And they want there to be a single dedicated memory for both. And the patent doesn't do that. The patent has, so one thing I need to step back on, on both the fax modem and the memory, is there's two embodiments. And they're arguing one for this means plus function. So for the fax modem, which you all spent a lot of time asking questions about, the patent, first of all, fax modems are a whole different thing, a whole different world. What the patent talks about is an analog telephone network which needs a modem, and a digital telephone network that doesn't. And when your honors asked how do you, what's the disclosure on how to do this, the disclosure is in a digital telephone network, this is conventional technology. This is what digital phones work on. No need, no discussion about a modem in the digital network. So when they bring the modem in, they're just bringing in a whole separate thing. And Mr. Riley made a statement that's just not right. He said the Texas court required a modem, required a modem, not a telefax modem. Those are two different things. Now, the fax modem is only mentioned once in the entire spec, talking about fax services. But here's where we say the big importance of the different networks. In column three of the patent, it talks about the phone is for data transmission, separate from facsimile services. So this is column three down around line 57. And this is really the whole thing where it's talking about, it's in column three where it first talks about in a telephone network is the analog network in which a modem might be preferable for data transmission and the digital network, the GSM network, two different networks. They're focusing this claim construction on only the analog network. And then the patent goes on and says data transmission, cellular phone does data transmission as opposed to fax. Are we talking about the means for storing and processing image information? Oh, no. I'm on the modem right now, your honor. Let me turn to the memory means. There, there's two embodiments and they're focusing on one. Right. I see a figure five, which is your camera unit. You have a microprocessor 23 and nonvolatile memory 24. Right. There's two embodiments, your honor, which are figures one and figure two. Figure one is where the phone and the camera are integrated together. All right. Integrated, figure one. Figure two is where the camera's on a separate card. Those two embodiments, when the camera's on a second card, so when it talks about figure five, it tells you figure five is a general representation of both embodiments. Now, certainly in the general represent, in the separate card, you have separate memories. When it's a separate card. When it's an integrated system, you don't. And the patent tells you that. The patent talks about memory 13. If you read the patent, memory units 13 and memory units 24 are interchangeably used. They're used, they refer to 24 with respect to figure five. But the patent also talks about the memory unit in the integrated version. And in that case, the memory unit's being used for everything. It's not dedicated. Well, where does it say that? Well, for example, your honor, where it's used for other things, column three, it talks about putting column three down around line 54. It talks about software is recorded in memory unit 13, for example. The software, the operator of the entire phone. How do we know that's the image data? Well, I can show you that image data is also stored in 13. So, I was saying it's not just dedicated. For example, on column five, down around line 44, the images are scanned in by camera 14A. That's the optics. Scanned in by camera 14A to memory unit 13. This would be in the integrated version. Further down, around line 59, the simplest alternative is to store the information scanned in memory unit 13 by camera unit 14. So, if you read this, it's indistinguishable. 24 is with reference to the general embodiment, but if you read the patent, what you'll see is 24 is really with reference to, not 24, is dedicated, separate memory if you have a separate card. If you have an integrated system, there's not a word in here talking about the integrated system using that separate 24 memory. When you read the patent in the integrated system, everything's going into 13. Now, some of the language goes back and forth between 24 and 13, but those are examples further in column five at line 19 where we're talking about the camera. The user first scans the card by camera 14, then the information contained in it are transferred from the camera to memory unit 13. So, that memory unit 13 also stores the image information, and I submit if you read this patent carefully, you'll see that's in the integrated context. Can I get you to address, at least briefly, the 1Q2T issue? Sure, Your Honor. In the 068? Yes. So, first, it sounds like what they're making is a claim construction argument as to whether an operative, if you're talking about the claim construction or validity, or if they talk about a... It is a claim construction issue, but in any event, tell me why there is sufficient evidence to support the jury's conclusion that that claim was not invalid. Because there was no evidence other than their witness saying it would have been obvious. Their expert said it would have been obvious. There's no testimony from their witness. The witness said it would have been obvious to do this. Again, that was one other thing Mr. Riley said, which I don't think you'll find in the record anywhere. He said that Bayless teaches the one button, it doesn't. It talks about a hotkey. Their expert said anybody seeing the hotkey is where you push control and then zero, which we say is two operations, and at the re-exam, the patent office was told that that was two operations and accepted that. Well, go ahead. The patent office was expressly told control zero is two operations, two keys, whatever. What about when I do this? Is this one operation? Yeah, but that's not what this is. When it's a hotkey, you think you're doing that, but the hotkey, you're actually pushing the control first. If you do it, there's no such a thing as simultaneous in a computer. If you do the zero first, when you push it down, that zero gets pushed down a microsecond before the B, it's a control, it's a zero. You have to push. It's control zero. What did the jury say? They saw their guy saying, look, I push it, that's a single operation, and then they heard the evidence that that's not a single operation. It's control and then zero. It's pushing two keys that you have to have memorized. But why isn't that obvious? To go from that to a single key? Yes, from two to one. Because that's not why isn't it obvious. Put yourself back in time 20 years when this was being done. Today, you might say it's obvious. But again, when you go back 20 years ago, when Bayless was the best prior art they could find, they didn't have a single reference showing people doing it with a single key. Our expert, we talk about at the time, who is one of ordinary skill? Today, this is the hardest thing to present this type of a case to a jury trial, by the way, Your Honor, right? Because today, everybody knows the iPhone, right? Everybody knows the iPhone and everything seems obvious to you, to us. But back in 1990, I think this was in 96, nobody had done it before. It's not all that far back. In 96, there were, well. Well, no one was doing it. We are, this is the first patent that does it. And they heard the jury, heard the testimony about it wasn't obvious to do. Because, on a cell phone, why wasn't it obvious? Because a cell phone didn't have, it's not just the, it's the combination of elements, right? When you say that no one was doing it, are you saying that no one had gone from a two key operation for some kind of function in some kind of computer environment to a one key operation? I can't say that, Your Honor. I'm not saying that. I'm saying the evidence in the record, the only evidence in the record here that they presented is Bayless, which is a two key operation, and put it in the context back then. Remember, the phones back then didn't have the, didn't have the ability, the landscape, to put a single key there, because. But the patent isn't limited to a phone, right? That's what we're, well, it's a computer, a computer device, communication device, right. But the patent isn't limited to a telephone, so the argument about landscape doesn't seem to me to cut very heavily in your favor. And, in fact, the prior art they brought wasn't a computer, wasn't a cell phone. The prior art they brought was a desktop computer, and that was the prior art, and it doesn't have a single key. It doesn't show it. And the best they could have is an expert saying, trust me, there were other ways to do this. And the jury, the jury had all this evidence. They had the two sets of experts. They understood the level of skill, which was somebody with two years of experience back then. They understood the landscape of the technology and the development. They had all of this, and didn't accept their expert's testimony. And that's their, see, there's no document that you can look at, Your Honor, and say, oh, here's the patent, which, by the way, whether that's appropriate if the jury didn't hear it. But there's no piece of paper. There was no document. It was nothing more than their expert saying, trust me, I would have thought this was obvious 20 years ago. And our experts explained why it wasn't obvious with all of the differences between the prior art that was here, and the Patent Office didn't think it was obvious when presented to them in a re-exam. But both experts' testimony was very brief on this issue. I mean, I think your expert testified for about a page, maybe not even as much as the page. And it was mostly about, well, my students wouldn't have been able to do this. This would have been a hard assignment for my students. So it's not as if there were tons of evidence here. But, Your Honor, I would suggest I didn't have to have any expert testify, where it's their burden. I understand. And if you read the transcript and you read their expert in the cross-examination, not a credible expert. And I didn't need anyone. So we put an expert on where there's time limitations and things like that. Their expert says, trust me, it's there. Or not, it's not even it's there. Trust me, it was obvious to do this. Without showing anybody a piece of paper that it had been done before. Without explaining, you're right, very, very short. And in a jury trial, this is what happens. They don't want to put in any evidence other than an expert saying, trust me. And I cross the expert and the jury doesn't believe him. And our expert says the opposite. There's substantial evidence to support this jury verdict. And the motivation to combine and all that other stuff, I'll just ask, Your Honor, is to remember, this is a jury verdict with substantial evidence. I don't have my time. I know, Your Honor, and I appreciate that. Can you take a brief amount of time to talk about either of the other, either of your two cross-appeals that you... Sure, Your Honor, thank you. Let me just take the 231, because that one, I don't need to spend a lot of time on, 30 seconds. The 231, I think, is just a straight claim construction mistake by the court. Right? 231 is the issue of, there's a claim construction that we don't take issue with the claim construction. That, to get the exact language, to change a volume means to alter the degree of volume. The issue becomes, when you change or alter it, you have a scale from, let's say, 10 to 0, your radio at home, 10 to 0. The judge says, altering the volume takes you from 10 to 1, but doesn't include 0. We believe that it's the application of that claim construction that's just plain wrong, especially when you see that we have a two dependent claims. So, the words change of volume don't appear in the patent. They only appear in the claim. They were put into the claim as the superset for two dependent claims, reduce and stop. We just don't see any way at all that it's proper to say, reducing gets you to 1 on a 1 to 10, 0 to 10 scale, but doesn't include stopping as well. We just think that that's just a misapplication of the claim law, and that there's no way to read that claim to permit that. If I could just touch then, Your Honor, if you'd let me just on the 075 and the issue there, we won that one below. The judge, I think, got it wrong in two sentences. You won it in front of the... In the jury, right. That's exactly right. So, this is one question of substantial evidence. On the validity issue, the judge says there was substantial evidence. There's two references, 4.83 and 4.08. The judge says there is substantial evidence that if you start with 4.08 and go to 4.83, it's not obvious. She said there was substantial evidence. She says, but, it was our obligation to say, if you start with 4.83, would it have been obvious to then go to 4.08? And she makes a mistake, a fundamental mistake, and that is our expert did do that. And she cites it in her brief. He says, and there's the testimony, he says, put the two side by side. And this is in her, she quotes the quote, but she goes on and just says, doesn't mention it again. Our expert took the two references, says in it expressly, and this is at page 2482 of the appendix. He says, put the two side by side, and it wouldn't be obvious. And where the judge has already, Judge Robinson, has already found 4.08 to 4.83, there is substantial evidence, we think there's substantial evidence that this was not obvious. Now, if I understand, correct me if I've got this wrong, but if I understand it, Apple's position on obviousness was that you combine the 4.83 with the portion of the 4.08 that appears, I think, at 57262 dealing with response to set up, 5.2, .2, .3, .1, I think is the number. Right. It is all of this, Unabell, and Amal, right, but there's another section of 4.08 that seems much more pertinent, which is the call clearing section of 4.08. If you combine that section with 4.83, would you agree that there's obviousness here? No, Your Honor, putting these two... Why not? Because the question isn't, does the technology permit this to happen, all right? These sections are telling you you could put these things, the technology is in the standard. Let's just step back one. What is this patent about? It's the second call rejection, all right? You're on the phone with someone, a call comes in, you push your button, and it goes to voicemail. That's what this patent's about. Now, within the standard, the technology was there to allow that to happen. Nobody knew it. Our patent is the first patent to say you can reject the second call. And, Your Honor, here's one thing... 4.83 is saying, with respect to waiting call released by subscriber, and referring the reader specifically to 4.08. Isn't that exactly what that does? I don't have that exactly in front of me, but if I can take the point... This is at 57585 in the appendix. Just one second, Your Honor. 57585. 57585. Near the end of the volume 4. Volume 4, right? Okay, I've got it now. Okay. And, I'm sorry, where are you looking? I'm looking at 4.83, 1.3.1. Right. It's called Waiting Call Released by Subscriber B. And it refers the reader, after describing the function there, it refers the reader to 4.08. Presumably, you would think 5.4 of 4.08. I'll just say, Your Honor, there was absolutely no testimony about this section below, so forgive me if I'm not prepared to respond. Well, I think there actually was testimony, maybe not in the context of the invalidity argument, but I believe that this section 5.4, I could be wrong, but I believe that was before the jury in another case. All right, Your Honor, I'm not prepared on that one particular point. There's one point, though, that I will make in terms of the obviousness, and that is the 068 patent that they talk about as the second version of 4.83. I'm not going back to the 068 patent, but they talked about the 068 patent as also prior art, equivalent to 4.83. Right. And I just want to point out, Your Honor, that in that patent, which is what they say, this tells us what people were thinking back then, whether it would have been obvious to do this or not. And in Column 1 of that patent, it talks about the standard and what it allows you to do. And the one thing, and it gives you four examples. This is the first paragraph, lines 15 to 28. It tells you four things that the patent allows you to do with that. Not the patent. The GSM standard allows you to do with the second call. And none of those four are the call rejection. So I'm just saying, Your Honor, they point to this as the prior art, and it gives you an example of what people were thinking back then. What it thought, what they said, is what you could do with that second call. You could suspend the first call. You could disconnect the call and take the second call. You could merge the two together. Or you could disconnect that second call. Disconnect requires that you have accepted it first, and that's what this patent is showing. And what our patent shows is rejecting the call. That's not disconnecting. Disconnecting is accepting, connecting, and then dropping. Ours is rejecting it. It's this polite rejection. All I'm saying is 068, which they say is the prior art, puts you back there. And you realize people, this was an intention to politely reject. Although you're pointing to something, Your Honor, maybe it says that, and I just can't respond. Okay. Thank you very much, Your Honor, for the extra time. Thank you. And I think you actually have about 15 minutes, should you choose to use it. Thank you, Your Honor. I'd first like to return to Lucent and the disclosures in Lucent, because counsel said it did include a cell phone. Again, at column 2, line 5, it's very clear that Lucent includes cellular phone technology. Where is the Lucent reference? I don't have it marked. A57613. A57613. Correct. And directing the Court's attention to column 2, line 5, where it says alternatively the image capture device may be connected to or include a built-in cellular telephone. And so that's very clear. And then in terms of the use of the microprocessor, Lucent is very, very clear about this. And this is where the Patent Office got it wrong. The Patent Office said that Lucent's microcontroller 205, if you look at the diagram. So let me stop you there. What is missing, in your view, from Lucent vis-à-vis the patent? Just the display? Just the display. That's all that's missing from Lucent? That's all that's missing. And similarly, all that's missing... It struck me as curious that so much emphasis was put on Kyocera and Lucent was regarded as the secondary reference. And it struck me when I read it that Lucent was closer than Kyocera. Yes, you can do it both ways. And I think this is... But you did it the first way by emphasizing Kyocera and I'm kind of curious as to why. Because the simple substitution was taking an off-the-shelf microprocessor and using it for the processing circuitry in Kyocera. So you thought that substituting a microprocessor for a simple circuit is a simpler change than adding a display to a cell phone? It could be a simpler... Because the type of microprocessor is described in Lucent, the way in which you program it, the algorithms are all described in Lucent. But I think, Your Honour, the most important point here is we've been instructed by the Supreme Court and KSR not to do this sort of mechanical combination. It's not like you're trying to mush together one device with another, which is the way they approach it. You learn. The teachings are what a person of skill in the art, a person of ordinary skill and ordinary creativity, as the court said in KSR, learns from the teaching. And so in combination, you can include things from both. And so the problem of using a microprocessor was solved in Lucent. And, Your Honour, that's why the 07-8 says nothing about how to program a microprocessor, what architecture to use, whether you're doing an integrated structure or a separate structure. None of that is disclosed, because they treat it like an ordinary off-the-shelf component. I'd like to turn, if I've answered the court's questions about Lucent and KSR, to the 06-8. And again, I want to be very, very clear. Can I just ask, on the 07-8 and the camera-dedicated memory, why is Mr. Bauer wrong about the embodiment that combines everything and uses, I think, is it memory 13 for everything? Because the structure that's described in Claim 73, and by dedicated, we didn't mean solely, only, but a memory which is structurally dedicated to the processor. Because it has a single connection only to the camera. That is correct. And that is a key to the embodiment, because you can remove that camera unit. It's removable. And again, as you saw in counsel's argument, they sort of jump back and forth. Sometimes it's two processors, sometimes it's one processor, depending on whether they're claiming infringement or claim construction or validity. They keep jumping back and forth. And the law doesn't permit that. They need to be held to what they've disclosed, what structures they've actually disclosed here. On the 068, we're instructed to use our common sense as well as the testimony and evidence in the trial. And in Bayless, there are disclosed single function keys. Disconnect, for example, is on the screen. If you look at Table 100 in Bayless, there's a set of commands. Some involve two keys, some of them involve one key. There's no claim in the patent at all about two keys being less advantageous than a single key. It's not discussed at all. It's not treated as a point of novelty because it wasn't a point of novelty at all, at all. And I think that's demonstrated by the fact that Bayless... These two references are just on all fours. A hot key, and this was undisputed, in the knowledge of a person's skill in the art at that time, can mean one key or two keys. Bayless has examples of one key and two keys. Now, you say it was undisputed and clear that a person's ordinary skill would understand that, but that wasn't the testimony of trial by mobile media's experts, as I understand it. He said, no, this would be a step forward. A step forward to have one key. To go to one key. And Judge Bronson, your question, I think, was very precedent on that very issue because he said, why would that be important to go to a single key? Because of the real estate part. Because of a cell phone. It's a cell phone environment. And Claim 23 is a method claim. It's a method for controlling controlled states of calls. It could apply to a desktop computer. It could apply to a terminal phone on your desk. It could apply to a cell phone. And your evidence, since you bore the burden of proof on this, with respect to why that would be a very simple modification of the hot key function in Bayless is what? Dr. Balakrishnan's testimony, right? Dr. Balakrishnan's testimony. Which is very short on this. I mean, it's pretty much one question and one answer. It goes on a little bit more than one question. Maybe I've understated it by one. It doesn't go by much. But I think that goes to, there's not a whole lot you can say because it's so trivial to go from in an environment where single buttons already exist and are in Bayless. You disconnect by clicking on one button. It would have been helpful, I think. I mean, it's easy to second guess trial decisions. But it would have been helpful to have one piece of prior art that showed, hey, here's a way to go from two buttons to one. But Bayless gives that. Bayless gives that. Because it allows programmability of hot keys. He talked about this. In other words, Bayless is not just a static GUI. It's got a tool that allows you to modify the GUI so that you can change how the menus appear and whether they present in response to two keys or one. You can change the operations. And it's attacking the same problem. What was the basic problem of the 068 patent? Having to memorize commands. It wasn't one key or two keys. It was, we don't want to have to memorize complex numerical commands. And Bayless is doing the same thing using Windows. On a terminal. With menus and clicks and cursors. So it's attacking the same problem with the same solution. And it is simply an implementation detail that is trivial whether you drop that menu when you get a phone call that comes in, which they both do, or whether you allow the user to perform an operation to drop that menu. Can you address the 231 patent and why the district court was right in the claim construction and granting summary judgment on that? The reason the district court was correct is because the patent draws a distinction between stopping the sound and changing the volume. If you look at, for example, it has different embodiments. In one embodiment, you stop the sound. In other embodiments, you lower the volume. And if you look at diagrams 3 and 4, you will see that at points... Are there any claims on the 231 in your view that cover the stopping the sound embodiment? The claims 3, for example, and 4 include stopping the sound. So they have two functions. You can lower the volume, turn it down, or you can stop it altogether. And if you look at the diagrams in figures 3 and 4, figure 4, for example, includes both stopping the sound and changing the volume. For example, when another call comes in, you can, by hitting the send button, stop the sound. Or you can initiate the function to change the volume. Well, you referred to 3 and 4, but isn't that relationship between the dependent claims, at least in the re-examination patent, isn't that a problem for you? Because you've got 12, which talks about changing the volume, and then you've got 2 and 3, which respectively talk about controlling the state of the alert sound to stop the sound, and 3 to reduce the volume of the sound, as dependent claims from the independent claim 12. Why doesn't that make your opponents caseful? No, not at all, because those are additional functions. In other words, you've got one function, which is to change the volume. Control the state of the sound is to stop the sound. That sounds like changing the volume is by stopping the sound. But that's an additional functionality. For example, if you look at... Let's just look at the... I don't understand. So the dependent claim covers territory that's not covered by the independent claim? No, it adds a narrow functionality. In order to infringe claim 2, you have to have a system that allows you to lower the volume, and then, in addition, turning it off, turning the sound off. Why is, for example, the function in claim 3 of reducing the volume not simply a way of performing the task of changing the volume that's referenced in claim 12? Because it's in addition to what's in claim 12. But you say that, but why is it not... When you change the volume, one way to do it is to reduce the volume. Why is that an additional method? Well, the independent claim 12 doesn't tell you whether you're turning it up or down. It just says alter, right? And so the dependent claim says the additional functionality is you turn it down. You have the ability to control the state of the alert sound to reduce the volume. So between 2 and 3, there are two different ways to change the volume. Right? That's correct. One is to turn it off completely. Right. And the other one is to turn it down. And those are two alternative ways of changing the volume. In addition to the ability to change. I guess that's the confusing part. I guess for dependent claim 2, you're saying stopping the sound, that's additional functionality. So then, likewise, you're forced into a situation of saying claim 3's representation of reducing the volume must also be some kind of additional functionality beyond the independent claim changing the volume. Yes. So how is reducing the volume additional functionality on top of changing the volume? Because it's the direction in which you're changing. You're reducing. The independent claim just says control means for controlling said sound alert generator. Change a volume. It doesn't say to lower the volume. It says to change. That's why this is the genus claim. This is the broader claim, the independent claim. Then the dependent claim says it allows you to turn it, it narrows it by having to turn it down. There's a genus-species thing going on here. I think I agree with you. For claim 2 and 3. No, but claim 2 is an additional functionality. Again, if you look at figure 4, this is shown very clearly in figure 4. It says reduce volume of alert sound. That's one circuit. Then you have an additional circuit that says stop alert sound. Two different functions. And adding the additional functionality narrows the claim. That's why it's a dependent claim. Any other questions? No. Thank you. Thank you very much. I have one last minute, Governor. This will be a real one minute. I'll let you ask all the questions. That's true. I only have one minute to say. You didn't mean me personally. Sorry. Thank you. I only want to address the Lucent, the question why isn't Lucent the closest thing, the better thing. And your Honor, Lucent is not a cell phone. So it has a cell phone that says in one sentence it can be built in, but if you look at the Lucent patent, this is why the jury didn't present it. It's not a cell phone. Your Honor, look at figure two of the Lucent patent. The phone is not even shown in there. It says you can couple a phone to it. Yes, Your Honor. But this is why they wouldn't have presented it to the jury. It's not a phone.  the Lucent thing is that box that's connected by hard wire to a telephone. That's what figure one is showing. A box, a camera that's connected to the telephone network. That's figure one. Figure two, which is the detailed schematic, look where the phone is. It's not even shown on this. This is why the problem is that they wouldn't have used it. It's not a phone. It is a camera all the way through and then there's one line that says connected to the phone network. Now that could have been a phone, but the claim requires, Your Honor, a phone including all of these things. Not a camera that has a phone. But there's elements missing. It's not just the display. A phone that has a camera as opposed to a camera that has a phone. But, Your Honor, it's the third element, F3, that's not there. There's nothing in Lucent that shows you a second microprocessor. It's just not there. Thank you very much. Thank you, Your Honor. I appreciate the explanation.